THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
ANDREW R. TYLER, Appellant.

Second Department, April 26, 1978

### APPEARANCES OF COUNSEL

*Shea Gould Climenko & Casey (Milton S. Gould, Saul S. Streit* and *Richard F. Czaja* of counsel), for appellant.

*John F. Keenan, Deputy Attorney-General (Thomas A. Duffy, Jr., Mark M. Baker, Michael Shapiro, Mary Smith* and *Joseph Milano* of counsel), for respondent.

### OPINION OF THE COURT

O'CONNOR, J.

#### THE FACTS

The February 1975 Extraordinary Special and Trial Term

Grand Jury for New York County (hereinafter Grand Jury) conducted an investigation into the relationship, if any, between appellant, Andrew R. Tyler, a Justice of the Supreme Court of the State of New York, and certain individuals known to the New York City Police Department as gamblers. Raymond Marquez, or "Spanish" Raymond, was one of the gamblers whose alleged relationship with the appellant the Grand Jury sought to explore. Evidence had been presented that Marquez was at the head of a large illegal gambling operation and that he had been convicted of both Federal and State crimes. Further testimony before the Grand Jury tended to establish that on the evening of May 16, 1975 Marquez and the appellant met and spent one and one-half hours in each other's company. The Grand Jury sought to question the appellant about his meeting with Marquez in an effort to determine their relationship and to ascertain whether the crimes of bribery, bribe receiving or official misconduct had been committed.

The appellant appeared before the Grand Jury on several occasions. On March 2, 1976 he testified that he knew Marquez as a man who had been convicted "some years ago for policy" and that some time "in the fifties" he thought he had represented Marquez in a case that "had something to do with gambling", but he was not sure whether the case involved contempt. It was the appellant's further testimony that he had *not* spoken to Marquez, who had but recently been released from prison, since he had become a Justice of the Supreme Court.

However, on May 20, 1976, Judge Tyler made his final appearance before the Grand Jury and testified, *inter alia,* that, contrary to his prior testimony, when he had represented Marquez some years before, gambling or contempt had not been involved. Rather, he said that the case arose from a violation of probation by Marquez stemming from an assault on a woman. He acknowledged his awareness of Marquez's reputation as a notorious gambler who had often been prosecuted. He then testified, in substance, that following his March 2 appearance, he returned home and discussed the matter with his wife. He said that this conversation refreshed his recollection and that he had indeed seen and spoken to Marquez, since he had become a Judge. He said that he

couldn't fix the date, but that it was "probably somewhere around May". He testified that he met Marquez and his wife outside Patsy's Restaurant on 58th Street, adding, "I think that's where it was", and he went on to say that it was an accidental or chance meeting and that he and the Marquezes had a drink, had a "chit-chat" and that he left after 10 or 15 minutes. In response to the question: "And they [the Marquezes] remained in the place?", he replied, "I believe so."

At the trial, and as part of the People's case, Mrs. Betty Galler, acting forelady of the Grand Jury, testified that the jurors had been drawn and sworn on February 18, 1975. They were told that the subject matter of the inquiry was "the relationship between Judge Tyler and certain individuals recognized by the New York City Police Department as known gamblers".

Mrs. Galler further testified that the Grand Jury heard testimony from three police officers, all of whom had been assigned to conduct a surveillance of Judge Tyler, to the effect that on May 16, 1975 Marquez and his wife met Judge Tyler while the Judge's car was parked in front of Lincoln Center. The testimony indicated that the Marquezes entered the Tyler automobile and were driven by appellant to Patsy's Restaurant in Manhattan, where they stayed for approximately one and one-half hours. The testimony then established that the three of them left Patsy's together and that the appellant drove the Marquezes in his car to a garage where the Marquez car had been previously parked.

It was Mrs. Galler's concluding testimony, in substance, that when the Judge was questioned about his meeting with Marquez, the purpose was to discover the contents of the meeting so the jurors could "determine the relationship as to whether there was any crimes of bribery, bribe receiving or official misconduct committed."

As a result of his testimony before the Grand Jury, appellant was indicted on four counts of perjury in the first degree. The trial jury acquitted defendant on the first count and convicted him on counts two, three and four. It is from the judgment of conviction that this appeal is taken.

### THE LAW

■ Perjury in the first degree is defined by section 210.15 of the Penal Law as follows:

"A person is guilty of perjury in the first degree when he swears falsely and when his false statement (a) consists of testimony, and (b) is material to the action, proceeding or matter in which it is made.

"Perjury in the first degree is a class D felony."

It is clear that the *sine qua non* for a conviction is that the false statement consist of testimony (oral and under oath before a duly authorized body) and that it be material to the "action, proceeding or matter in which it is made."

Before discussing the specific language of the three counts remaining in the indictment, it is noted that the Special Prosecutor concedes that the language of the indictment does not track the language of the questions asked appellant before the Grand Jury. However, it is the prosecutor's position that a reading of the questions about the subject of appellant's meeting with Marquez and the appellant's answers thereto amply support the assignment of perjury in each count. The prosecution suggests that the meaning and truthfulness of appellant's answers must be measured in the context of the questioning and, in support of this proposition, cites the cases of *United States v Bonacorsa* (528 F2d 1218, 1221) and *United States v Paolicelli* (505 F2d 971, 973). Against this background, let us now proceed to examine the three remaining counts in the indictment.

Count two charges that: "Upon being asked where he saw Marquez for the first time on *May 16, 1975* [appellant] testified that it was in front of Patsy's Restaurant." (Emphasis supplied.)

The record, however, discloses that following questions and answer:

"Question: When was that?

"Answer: I couldn't fix the dates. Probably somewhere around May. May of '75, somewhere around there."

It is clear that the date of May 16 was mentioned neither in the question nor in the answer and it is appellant's position that the evidence on this count was simply insufficient as a matter of law in that the conviction required the drawing of inferences from his testimony. In support of that proposition, the appellant cites *People v Rinaldi* (34 NY2d 843) and argues that here the error is compounded in that the inferences are drawn not by the defendant, as in *Rinaldi*, but by the prosecutor himself.

The prosecutor responds by reasserting his position that in the full context of appellant's testimony, it is clear that he was referring to the date in question, May 16, 1975.

The Special Prosecutor maintains that the defect, if any, was cured by appellant's subsequent testimony that his meeting with Marquez was a chance meeting, whereas in truth and in fact, the prosecutor maintains, it was a planned meeting. However, count two is not predicated upon, nor was the case tried upon, that theory.

Indeed, the Trial Judge charged the jury with respect to that count as follows: "in order to find the defendant guilty of perjury in the first degree, you must find beyond a reasonable doubt that, one, the defendant intentionally swore falsely when he testified * * * that he first saw Raymond Marquez in front of Patsy's Restaurant".

The prime questions here to be decided are whether the appellant's answers, even if false, were material and whether he intentionally swore falsely. The specific date or the exact place of any meeting between Judge Tyler and Marquez was clearly not material to the thrust of the investigation. The crucial element here was whether the two had *ever* met at all and, as noted, appellant had already recanted his prior denial and had testified that in fact they had met "probably somewhere around May. May of '75, somewhere around there." It is highly significant that the trial jury, obviously concluding that appellant, by this recantation, had cleansed himself of any perjury on this issue, acquitted him on count one. Hence, the immateriality of the charges set forth in count two and the fact that appellant did not intentionally swear falsely when he gave the answer in issue, are apparent, and, accordingly, that count should have been dismissed (see *People v Blumenthal,* 55 AD2d 13).

■ Count three charges that: "The defendant upon being asked how long his *meeting* with Marquez lasted, testified that their *meeting* has lasted about ten to fifteen minutes." (Emphasis supplied.)

The record, however, discloses the following:

"Question: What happened after you went into Patsy's?

"Answer: I think I had a drink.

"Question: Was there a bar there, or did you have it at the table?

"Answer: Sitting right at the entrance of the door, I had a drink at the door.

"Question: Did you have a drink alone?

"Answer: No. He and his wife sat down.

"Question: How long did *that* take?

"Answer: About ten or fifteen minutes." (Emphasis supplied.)

The question, "How long did *that* take?", is to a degree, at least, debatably obscure, ambiguous and subject to misunderstanding. The appellant maintains that the question does not possess that degree of specificity or preciseness which fair play and the law require.

On the other hand, it is the prosecutor's position that in the context of the questions asked and the answers given, the word "that" is susceptible of but one reasonable meaning, viz., appellant's meeting with Marquez. Assuming the validity of that argument, it is clear that the factual situation presented the Special Prosecutor with a golden opportunity, and indeed an obligation, to "flush out" the whole truth (see *Bronston v United States,* 409 US 352, 362). Armed with detailed knowledge of defendant's every move that evening, an intelligent and fair in-depth cross-exmaination would have completely dispelled any existing ambiguity, the appellant's recollection would have been refreshed and a proper and unshakeable foundation for this count of perjury would have been laid. At that point, the prosecutor knew, as already noted, that prior testimony before the Grand Jury directly contradicted the appellant's testimony and that "that meeting" took an hour and one-half. Proper prosecutorial inquiry at that point might well have penetrated to the very heart of the matter, viz., was there indeed a relationship between this Justice of the Supreme Court and this known gambler? If so, what was that relationship? Did it involve bribe giving or bribe taking? It is here worthy of note that the prosecution frankly conceded that, despite the persistent and extended surveillance of appellant, there was *no* evidence connecting him to any gambling conspiracy or any involvement in crimes of any kind. Nor does it appear from the record that there was evidence establishing any substantive crime involving *anyone* despite this rather long and intensive Grand Jury investigation. Under these circumstances, ordinary fair play and simple justice demanded, and intelligent cross-examination required, that the matter be further explored and that from the wealth of

contradictory evidence available to the prosecutor, the appellant's recollection of events which had taken place a year before might at least have been refreshed so that he would have a last clear chance to tell the truth or to lie. Justice would indeed have been better served by whatever course appellant then chose to pursue.

The failure of the prosecutor to follow this time-tested stratagem of basic cross-examination procedures suggests, at least, that the prime purpose of the prosecutor who presented the case to the Grand Jury (and who is no longer in office) was not so much to pursue a legitimate line of inquiry but to indict the appellant for perjury. In *Brown v United States* (245 F2d 549, 555), the court put it this way: "The court is of the opinion that the evidence in this case clearly established that * * * [the prosecutor's] purpose was simply to do what he did, viz., to extract from defendant his testimony about the talk in which he had taken part in St. Louis on May 3, 1950, knowing that his recollection of it differed from that of the others present, and to get him indicted for perjury. He knew how each of the parties to that talk, including defendant, remembered it because each had made his sworn statement to investigator Strain, and three of the parties to the talk had already given their recollection of it to the grand jury before Newcomb called defendant. Extracting the testimony from defendant had no tendency to support any possible action of the grand jury within its competency. The purpose to get him indicted for perjury and nothing else is manifest beyond all reasonable doubt."

It is highly questionable whether appellant's answer, "[It took] about ten or fifteen minutes", was at all material to the investigation being conducted by the Grand Jury, involving, as it did, the possibility that a bribe was passed during the course of that meeting. In this context, and recognizing that a bribe can be consummated in a matter of seconds, whether the meeting took 10 minutes or 10 hours would appear to be totally immaterial (see *People v Perillo*, 48 AD2d 862). It should be here noted that materiality is not one of the requisite elements of the crime of perjury in the third degree, which is a class A misdemeanor (Penal Law, § 210.05). However, as already indicated, the then Special Prosecutor totally failed to expand a line of inquiry so as to explore, and thus refresh, appellant's recollection. Hence, appellant's answers as to questions pertaining to counts two and three, even if false,

failed to rise to even the misdemeanor level. It is extremely doubtful that such answers, under the circumstances, demonstrated an intention on appellant's part to make untruthful responses. Based upon all of the foregoing, count three should have been dismissed.

■ Count four charges that: "The defendant upon being asked what happened after conversing with Marquez in Patsy's Restaurant, testified that after his conversation with Marquez had ended, he exited the restaurant and left Marquez inside the premises."

Yet the record indicates as follows:

"Question: What happened then?

"Answer: I got up and left.

"Question: And they remained in the place?

"Answer: *I believe so.*" (Emphasis supplied.)

Obviously, to sustain a charge of perjury here, it was the prosecution's burden to demonstrate that Judge Tyler testified falsely to his "belief" as he responded to the leading question, "And they remained in the place?"

The prosecutor, however, suggests that the statement, "I believe so", is not, in context, an assertion of belief, but an assertion of fact. He maintains that appellant's Grand Jury testimony contains basically no evidence of confusion or misunderstanding and that, in any event, the issue of confusion was properly submitted to the jury and that the jury's conclusion that appellant intentionally made false statements, not as a result of mistake, inadvertence or inattention, is amply supported by the record and should not be disturbed. We reject these contentions and hold that the appellant's "I believe so" answer clearly constitutes an operation of the mind and cannot be used, absent compelling proof of its falsity, as a predicate to sustain an indictment charging him with having made—in the purport of count four—a flat, outright factual declaration (see *People v Rinaldi,* 34 NY2d 843, *supra; People v Blumenthal,* 55 AD2d 13, *supra).* "The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry. *United States v. Wall,* 371 F. 2d 398 (CA6 1967); *United States v. Slutzky,* 79 F. 2d 504 (CA3 1935); *Galanos v. United States,* 49 F. 2d 898 (CA6 1931); *United States v. Cobert,* 227 F. Supp. 915 (SD Cal. 1964)." *(Bronston v United States,* 409 US 352, 360-361, *supra.)* It is axiomatic that a perjury prosecution cannot be

based on evidence that is as consonant with fallibility of memory as with willful falsification *(People v Samuels,* 284 NY 410; *People v Lombardozzi,* 35 AD2d 528, affd 30 NY2d 677).

In view of appellant's expressed uncertainty, whether real or feigned, the simple pursuit of truth dictated a need, at that juncture, for the prosecution to pursue the matter further and in depth.

Under the circumstances here presented, it becomes increasingly clear that the prosecutor, armed to the teeth as he was with detailed knowledge of every move made by the appellant on that night in May a year before, continued to ask questions which were inherently difficult of accurate recall in order to obtain a perjury indictment. It should be here noted that although the trial court was requested by appellant's attorney to charge on fallibility of memory, it refused to do so (see *People v Rinaldi, supra; People v Lombardozzi, supra; People v Alberga,* 57 AD2d 755). We repeat the words of the court in *Brown v United States* (245 F2d 549, 555, *supra):* "The purpose to get him indicted for perjury and nothing else is manifest beyond all reasonable doubt."

In *United States v Icardi* (140 F Supp 383, 388), we find that "the test of materiality is whether the false testimony was capable of influencing the tribunal on the issue before it."

In the case before us it is manifest that the main purpose of the line of inquiry was to have appellant indicted for perjury. Hence, the false answers appellant was charged with having given did not relate to a material matter and, under the circumstances, it cannot be held that appellant intentionally testified falsely when he made the responses here in issue. This count should therefore have been dismissed.

Accordingly, the judgment should be reversed and the indictment dismissed.

DAMIANI, J. P., TITONE and SUOZZI, JJ., concur.

Judgment of the Supreme Court, New York County, rendered December 1, 1977, reversed, on the law, indictment dismissed and case remitted to the Supreme Court, New York County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.