THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
JOSHUA POMERANTZ, Appellant.

Second Department, July 31, 1978

APPEARANCES OF COUNSEL

*Julia Pamela Heit (Rhodes & Fisher [Steven W. Fisher]* of
counsel), for appellant.

*Charles J. Hynes*, Deputy Attorney-General (*Richard D. Carruthers* and *Arthur Weinstein* of counsel), for respondent.

## OPINION OF THE COURT

HAWKINS, J.

The defendant appeals from a judgment of the Supreme Court, Kings County, rendered October 19, 1977, convicting him of three counts of perjury in the first degree and imposing sentence. The judgment should be reversed, on the law, and the indictment dismissed.

The defendant operates the Pomerantz Paper Company, a wholesale distributor of paper goods and household chemicals in Brooklyn, New York. He does most of his business with nursing homes and health-related facilities in the metropolitan area. The defendant has been convicted of perjury in that he lied to a Kings County Grand Jury which was investigating fraud in the nursing home industry in New York.

The events leading up to the defendant's perjury conviction commenced in 1975. One Ira Feinberg had been convicted in Federal court on charges of securities fraud and conspiracy. The Federal prosecutor in that case was subsequently appointed as a prosecutor in the office of the Deputy Attorney-General (Special Prosecutor) investigating nursing home fraud. It was agreed that if Feinberg co-operated with New York State's investigation into nursing home fraud, the Federal authorities would recommend that the Federal court reduce his interim sentence of 18 months.

Early in 1975, at the instruction of the office of the Special Prosecutor, Feinberg telephoned the defendant and asked him to come to his nursing home in Emerson, New Jersey, to discuss the purchase of supplies for the home. The meeting was set for July 15, 1975. Before the defendant arrived in New Jersey that day, Feinberg conferred with the New York authorities and a recording device was concealed on his person. The device was activated when the defendant arrived at the nursing home and it recorded their entire conversation.

After discussing the kinds of products that he would need, Feinberg began to question the defendant as to whether he could get a "special deal". The defendant initially avoided the topic, but Feinberg returned to the question several times, indicating that he should be able to "make a few dollars" since he was not only the administrator of the home, but its

owner as well. Finally, the defendant suggested that he could add 10% to the bills which he submitted to the nursing home and give it back to Feinberg in cash. The conversation then ended.

In 1976 a Kings County Grand Jury was investigating corruption in New York's nursing home industry. The inquiry focused on the extent to which suppliers of goods and services were giving kickbacks to nursing home operators or employees. On May 21, 1976, 10 months after his meeting with Feinberg, the defendant was called to testify before the Grand Jury. Before testifying, the defendant asked for and was granted immunity.

In the course of his testimony, the defendant denied knowledge of any special deals by which nursing home bills were inflated by 10% with the money being funneled back to the nursing home administrator. The defendant stated that he had never even discussed inflated bills or extra invoices with any nursing home administrators. The defendant further stated that he could not recall ever having engaged in a kickback arrangement and admitted that if he had done so, he would have remembered it. The defendant testified that he did not remember soliciting business from anyone named Ira Feinberg, either at the Manor Nursing Home in Emerson, New Jersey, or at the Manor Nursing Home in Tenafly, New Jersey, both of which are owned by Feinberg. However, the defendant did state that he did not remember everyone from whom he had solicited business and that it was possible that he had met Ira Feinberg. The defendant went on to state that he did not remember suggesting to Feinberg or any New Jersey nursing home operator that he could provide bills inflated by 10%. Finally, the defendant stated that he did not recall telling Mr. Feinberg that he would deliver kickback money in person.

At one point during the questioning the defendant asked to speak to his attorney. However, the Special Prosecutor indicated that he had only one further question. More than 20 questions were thereafter asked before the testimony was completed.

The defendant was then indicted on three counts of perjury. Count one charged that the defendant lied when he denied knowledge of nursing home kickbacks. Count two charged that the defendant lied when he denied that he had ever discussed kickbacks with nursing home administrators. Count three

charged that defendant lied when he denied that he had ever offered kickbacks to nursing home administrators. At the trial, the primary witness for the People was Ira Feinberg, who testified to his meeting with the defendant in New Jersey. While the prosecution presented two other witnesses against the defendant, their testimony was not conclusive. Thus, the only significant proof at the trial that the defendant knew about kickbacks, had discussed kickbacks and had offered kickbacks to nursing home personnel, centered around his meeting with Feinberg. The defendant was found guilty on all counts and was sentenced to serve concurrent terms of from zero to three years' imprisonment on each count. The judgment of conviction should be reversed and the indictment dismissed.

The basic difficulty with the defendant's perjury convictions stems from the fact that he was questioned before a New York Grand Jury about a transaction which occurred in New Jersey and which had no relevance to New York. Indeed, the fact that the perjury charges were based upon an out-of-State transaction was no accident; it was the Special Prosecutor who directed Feinberg to summon the defendant to New Jersey and instigate the kickback discussion. As will become evident, this contrived meeting, and the subsequent questioning of the defendant about it, served no legitimate law enforcement objective and was designed solely to obtain a perjury indictment. To that extent, this excess of prosecutorial zeal violated certain principles of fairness recently enunciated by this court and by the Court of Appeals. (See *People v Tyler,* 62 AD2d 136; *People v Isaacson,* 44 NY2d 511.)

In *People v Tyler (supra),* the defendant, a Justice of the Supreme Court, was accused of lying before a Grand Jury which was investigating his relationship to one Raymond Marquez. It appeared that the New York City Police Department had had Tyler under surveillance for a lengthy period of time. On May 16, 1975 the police followed him to a particular restaurant where he met Marquez for a period of shortly more than an hour.

Subsequently, Tyler was called before the Grand Jury and asked about his meeting with Marquez. In response to certain questions, Tyler gave answers that were not accurate. However, his answers were somewhat equivocal and the prosecutor failed to probe Tyler's story during his direct examination, despite the fact that the prosecutor had massive amounts of

detail about the meeting with Marquez. Relying on this as one ground for reversal, this court commented (62 AD2d, at p 143): "The failure of the prosecutor to follow this time-tested stratagem of basic cross-examination procedures suggests, at least, that the prime purpose of the prosecutor who presented the case to the Grand Jury (and who is no longer in office) was not so much to pursue a legitimate line of inquiry but to indict the appellant for perjury. In *Brown v United States* (245 F2d 549, 555), the court put it this way: 'The court is of the opinion that the evidence in this case clearly established that * * * [the prosecutor's] purpose was simply to do what he did, viz., to extract from defendant his testimony about the talk in which he had taken part in St. Louis on May 3, 1950, knowing that his recollection of it differed from that of the others present, and to get him indicted for perjury. He knew how each of the parties to that talk, including defendant, remembered it because each had made his sworn statement to investigator Strain, and three of the parties to the talk had already given their recollection of it to the grand jury before Newcomb called defendant. Extracting the testimony from defendant had no tendency to support any possible action of the grand jury within its competency. The purpose to get him indicted for perjury and nothing else is manifest beyond all reasonable doubt.' "

In *People v Isaacson (supra)*, the Court of Appeals reversed defendant's conviction for criminal sale of a controlled substance in the first degree. The police initially captured an individual and seized a certain substance from him which they thought was cocaine. Upon examination, however, the police discovered that the substance seized was not a controlled substance. The police concealed this fact from the individual and then persuaded him to co-operate with them by acting as an informer. The informer then pressured defendant, Isaacson, into selling him cocaine by stating that he needed money in order to hire an attorney for his own defense. Finally, defendant agreed to sell cocaine, but insisted that the sale occur in Pennsylvania. The informer then tricked defendant into entering New York State by arranging for the sale to take place at a bar just inside an *unmarked boundary.*

In reversing the conviction, the Court of Appeals relied on the due process clause of the State Constitution, rather than the statutory defense of entrapment (Penal Law, § 40.05). (Since defendant had made prior drug sales and had a propen-

sity to commit the crime charged, entrapment could not be established.) Three factors were cited as requiring a dismissal of the indictment: (1) defendant's prior drug sales were minor and thus his propensity to participate in this particular transaction was minimal; (2) defendant was persuaded to make the New York sale only by the deceitful enticement of the informer; and (3) in the light of the first two factors, it was obvious that the police were not interested in crime prevention or any other legitimate law enforcement objective, but only in obtaining a drug conviction of *anyone they could catch.*

In both *Tyler* and *Isaacson,* the courts have indicated an increasing distaste for overzealous prosecutorial conduct which encourages violations of the law and which betrays an unbounded thirst for criminal convictions. Unless the desire for prosecution is grounded in some legitimate law enforcement objective, it may precipitate conduct which exceeds the bounds of fair play. In the instant case, the prosecutor sought a perjury indictment against the defendant solely because he would not co-operate in the nursing home investigation. As will be shown later, it was this desire which caused the Special Prosecutor to discourage the defendant from seeking badly needed aid of counsel during his Grand Jury testimony.

A review of the record indicates that the Grand Jury interrogation of the defendant served no legitimate law enforcement objective; the only conceivable purpose for the transaction and subsequent interrogation was to set the stage for a perjury prosecution. Certainly, there was no significant prosecutorial purpose to be served by arranging the meeting with Feinberg. There could be no hope of convicting the defendant for the underlying nursing home fraud since it is elementary that New York has no jurisdiction to prosecute a person for crimes committed in New Jersey. Nor was there any investigative purpose in questioning the defendant before the Grand Jury about his meeting with Feinberg. The Special Prosecutor had tape recorded the conversation between the defendant and Feinberg and knew more about the incident than the defendant. Since the two men never discussed New York nursing homes, their discussion was not relevant to nursing home fraud in this State.

The Special Prosecutor claims that he had a legitimate purpose for setting up the Feinberg meeting, namely, to provide an independent means of measuring the defendant's

credibility before the Grand Jury. However, the defendant's Grand Jury appearance occurred more than 10 months after his meeting with Feinberg, and it does not appear that the defendant had any subsequent meetings with Feinberg in which kickbacks were made or even discussed. Considering the lapse of time and the fact that the defendant routinely solicited business from many nursing home owners, the Special Prosecutor's test of credibility is of doubtful validity.

Even assuming that the Feinberg meeting offered a valid test of the defendant's credibility, the assessment of his veracity certainly did not require that he be prosecuted for perjury. This is especially true since the questions *which were the subject* of the prosecution were not relevant to the Grand Jury investigation. While the statute defining perjury in the third degree (Penal Law, § 210.05) does not make materiality an element of the crime, the prosecutor must have some good faith purpose behind his questions, beyond a mere perjury prosecution (cf. *People v Tyler,* 62 AD2d 136, *supra). As a* minimum, there must exist the *possibility* that the questions posed may elicit helpful information.

This departure from matters relevant to the Grand Jury worked a substantial prejudice to the defendant's Fifth Amendment privilege against self incrimination. Prior to testifying before the Grand jury, the defendant asked for, and was granted, immunity pursuant to CPL 190.40. Consequently, the defendant could not be convicted in New York State courts for any matter about which he testified before the Grand Jury, unless the conviction was for perjury or contempt (see CPL 50.10, subd 1). The question in this case is to what extent the defendant's privilege against self incrimination would be respected in another jurisdiction, namely, New Jersey.

Prior to the decision in *Murphy v Waterfront Comm.* (378 US 52), witnesses were confronted with the dilemma of prosecution in one jurisdiction based upon statements made to another sovereign under a grant of immunity (see, e.g., *Feldman v United States,* 322 US 487; *United States v Murdock,* 284 US 141). Thus, a witness could be compelled to testify before a State Grand Jury although Federal authorities might later use that testimony to prosecute him under Federal law *(Knapp v Schweitzer,* 357 US 371). This result occurred because the Supreme Court of the United States had held that

the Fifth Amendment only imposed restrictions on Federal authorities and did not apply to the States.

However, in *Murphy v Waterfront Comm. (supra)*, the Supreme Court held that the Fourteenth Amendment made the Fifth Amendment privilege against self incrimination fully applicable to the States. Accordingly, the court concluded that when a witness testifies before a State tribunal under a grant of immunity, he receives a "use" immunity in the Federal courts; Federal authorities may make no use whatever of any incriminating information that a witness might divulge in the course of his testimony.

The question of whether one State's grant of immunity will be respected in another State is less certain. At this moment there is no United States Supreme Court decision directly on the point which would bind the several States. Judicial authority on the matter is sparse (see *People v Lev,* 91 Misc 2d 241). In *People v Lev (supra),* on facts nearly identical to those before us, the Supreme Court, Bronx County, took the position that the rationale of *Murphy v Waterfront Comm. (supra)* applies to all jurisdictions in the Federal structure, and held that a witness in New York, asked about his conduct in New Jersey, would have use immunity in that State. This view also has the support of at least one highly regarded authority (Richardson, Evidence [Prince, 10th ed], § 529, p 524). Applying this rationale, the defendant could not have refused to answer the questions about his meeting with Feinberg on a claim of self incrimination, since he would have had immunity in New Jersey.

Nevertheless, the defendant's convictions must be reversed and the indictment dismissed because he was not given a fair opportunity during the Grand Jury proceeding to ascertain the scope of his immunity. As is obvious by now, the extent of the defendant's immunity is not a matter free from doubt. Moreover, the Special Prosecutor was fully aware that the question of the extra-State effect of New York's immunity would arise, because the defendant had been "set up" in New Jersey, with a view towards questioning him in New York. Despite this knowledge, the Special Prosecutor failed to inform the defendant that his immunity would apply to conduct which occurred outside this State. The defendant was obviously confused on this point; during his Grand Jury testimony, he asked to speak with his attorney immediately after answering a question about Ira Feinberg. Instead of granting the

request, the prosecutor discouraged the defendant from seeking legal counsel by stating that there would be only one additional question. This further suggests that the prosecutor was only interested in obtaining a perjury indictment once he had determined that the defendant was lying.

In the light of the foreknowledge of the Special Prosecutor that a complex question of privilege would arise as to which no definitive answer existed, it would have been preferable for him to have explained to the defendant the scope of his immunity. However, as a minimum, the defendant should have been permitted to speak to his attorney immediately upon his request. (See *People v Ianniello,* 21 NY2d 418.) In the circumstances of this case, the failure to do so requires a reversal (cf. *People v Tyler,* 62 AD2d 136, *supra).*

LATHAM, J. P., DAMIANI and MARGETT, JJ., concur.

Judgment of the Supreme Court, Kings County, rendered October 19, 1977, reversed, on the law, indictment dismissed and case remitted to the Supreme Court, Kings County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.