

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-10-1999

# USA v. Serafini

Precedential or Non-Precedential:

Docket 98-7250

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"USA v. Serafini" (1999). *1999 Decisions.* Paper 35.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/35

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 10, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-7250

UNITED STATES OF AMERICA,
Appellant

v.

FRANK SERAFINI

On Appeal from the United States District Court
for the Middle District of Pennsylvania
D.C. No. 97-cr-00225-6
District Judge: Hon. Thomas I. Vanaskie

Argued October 6, 1998

BEFORE: SLOVITER AND COWEN, Circuit Judges
and POLLAK, District Judge*

(Filed: February 10, 1999)

Bruce Brandler (argued)
Office of United States Attorney
228 Walnut Street
P.O. Box 11754
Harrisburg, PA 17108

Attorney for Appellant

_____

* Honorable Louis H. Pollak, United States District Judge for the Eastern
District of Pennsylvania, sitting by designation.

Sal Cognetti, Jr. (argued)
Foley, Cognetti & Cowley
507 Linden Street
Scranton Electric Building
Scranton, PA 18503-1666

Daniel T. Brier
Myers, Brier & Kelly
108 North Washington Avenue
Suite 700
Scranton, PA 18503

Attorneys for Appellee

OPINION OF THE COURT

POLLAK, District Judge.

This is an appeal by the government from an order of the District Court for the Middle District of Pennsylvania granting in part, and denying in greater part, a motion to dismiss the one count of a 140-count indictment which pertains to defendant-appellee Frank Serafini. The count in question charges Serafini with six allegedly false statements to a grand jury.1 The motion to dismiss challenged all six charges. The District Court sustained five of the charges but dismissed one. Dismissal of one of the charges was required, so the District Court concluded, because, in the court's view, the question that prompted the allegedly false answer could not support an allegation that the defendant had made a "false material declaration" before the grand jury in violation of 18 U.S.C. S 1623(a).2 On this appeal, in

_____

1. The charging indictment lists six allegedly false statements. However, the District Court's memorandum opinion consolidates two of those statements, apparently as a single basis of liability. United States v. Serafini, 7 F.Supp.2d 529, 536 (M.D. Pa. 1998).

2. 18 U.S.C. S 1623(a) provides that "[w]hoever under oath . . . in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration . . . . shall be fined under this title or imprisoned not more than five years, or both." The essentially equivalent crime of "perjury" -- "stat[ing] or subscrib[ing] any

2

addition to addressing the substantive issue -- whether the District Court rightly dismissed the contested portion of perjury count 140 -- the parties, at this court's request, have also briefed the question whether, as the defendant contends, the government's appeal should be dismissed for want of appellate jurisdiction.

I

This prosecution stems from allegedly illegal campaign contributions by Empire Sanitary Landfill (Empire), various of its officers and employees, and persons associated with those officers and employees. Michael Serafini, defendant Frank Serafini's nephew and an officer of Empire, is alleged to have funneled Empire funds to various individuals as reimbursements, in contravention of the federal election laws, for contributions ostensibly made by those individuals to Robert Dole's 1996 presidential election campaign. Frank Serafini, a Pennsylvania state legislator during the period in question, is thought by the government to have received some of the Empire money, to have kept a portion of it as a reimbursement for his own contribution to the Dole campaign, and to have passed the balance on to his legislative aide, Thomas Harrison, as a reimbursement for a contribution made by Harrison.

_____

material matter [one] does not believe to be true" after "having taken an oath before a competent tribunal, officer or person, in any case in which a law of the United States authorizes an oath to be administered, that [one] will testify, declare, depose, or certify truly" -- is defined in 18 U.S.C. S 1621. As this opinion reflects, the case law treats "false material declaration" and "perjury" interchangeably. See United States v. Lighte, 782 F.2d 367, 372 (2d Cir. 1986) ("In the discussion that follows we analyze the general rules that courts apply to the language of S 1623 -- treated the same as perjury under S 1621 -- and then consider the defenses to perjury advanced by appellant in this case.").

A close kin to SS 1621 and 1623 is 18 U.S.C.S 1001, which imposes criminal liability on any person who, "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully ... makes any materially false, fictitious, or fraudulent statement or representation." See Brogan v. United States, 118 S.Ct. 805 (1998).

3

When Frank Serafini initially appeared before the grand jury investigating these matters, he invoked his Fifth Amendment rights. The government then immunized him against prosecution. See In re Grand Jury, Misc. No. 95-98 (M.D.Pa. Apr. 29, 1997) (order compelling appearance and granting immunity except for "perjury, giving false statement, contempt" or otherwise failing to comply with the District Court's order.). The defendant was then recalled before the grand jury and testified. Some months later, the grand jury handed down a 140-count indictment, charging Michael and Frank Serafini, as well as four others, with a multiplicity of offenses. Count 140, the only count containing charges against Frank Serafini, alleged that he had committed six[3] separate instances of false material declaration while testifying. On Serafini's motion to dismiss count 140, the District Court found five of the six charged instances to be unproblematic but concluded that one question was so framed that the answer could not support a false declaration charge. Accordingly, the District Court, while sustaining the bulk of count 140, dismissed the sub-portion of that count that deals with Serafini's answer to the faulty question. The government thereupon filed this interlocutory appeal from the District Court's dismissal of the sub-portion of count 140.

II

We are met at the outset by the defendant's contention that we lack appellate jurisdiction.

The government, as appellant, invokes this court's jurisdiction pursuant to the Criminal Appeals Act of 1970, as amended. That statute provides, in pertinent part:

> In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information or granting a new trial after verdict or judgment, as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

_____

3. See supra note 1.

        **

        The provisions of this section shall be liberally
        construed to effectuate its purpose.

18 U.S.C. S 3731.

In the instant case, as noted above, the District Court
struck one portion of the single count of the indictment
pertaining to Frank Serafini. Serafini points out that S 3731
authorizes appellate review of a district court order
"dismissing an indictment . . . as to any one or more counts
. . . ." Since the interlocutory order challenged by the
government dealt with only a part of one count, leaving the
balance of the count in place, Serafini contends that we
have no authority to review the District Court's ruling.
However, this court has held that the dismissal of a portion
of a count of an indictment is sufficient to establish
appellate jurisdiction under S 3731 if the dismissed portion
of the count constitutes an independent ground of criminal
liability. United States v. Conley, 37 F.3d 970, 975 (3d Cir.
1994). Our holding was expressly based upon the
authoritative construction of S 3731 announced by the
Supreme Court in Sanabria v. United States, 437 U.S. 54,
69 n.23 (1978). There, speaking through Justice Marshall,
a five-Justice majority stated:

        We agree with the Court of Appeals . . . that there is
        no statutory barrier to an appeal from an order
        dismissing only a portion of a count. One express
        purpose of 18 U.S.C. S 2731 (1976 ed.) is to permit
        appeals from orders dismissing indictments "as to any
        one or more counts." A "count" is the usual
        organizational submit of an indictment, and it would
        therefore appear that Congress intended to authorize
        appeals from any order dismissing an indictment in
        whole or in part. Congress could hardly have meant
        appealability to depend on the initial decision of a
        prosecutor to charge in one count what could also have
        been charged in two, a decision frequently fortuitous
        for purposes of the interests served in S 3731. To so
        rule would import an empty formalism into a statute
        expressly designed to eliminate "[t]echnical distinctions
        in pleadings as limitations on appeals by the United

5

> States." H.R. Conf. Rep. No. 91-1768, p. 21 (1970);
> accord, S. Rep. No. 91-1296, p. 5 (1970).

In so ruling, the Court in Sanabria rejected the narrower reading of S 3731 -- namely that the statute by its terms simply authorizes appellate review of an order dismissing "one or more counts," thereby precluding appellate review of an order dismissing only a portion of one count-- urged by Justice Stevens in a concurring opinion.4 To be sure, the Tenth Circuit, in United States v. Louisiana Pacific Corp., 106 F.3d 345 (10th Cir. 1997), has declined to follow the Sanabria majority's pronouncement with respect to S 3731: that pronouncement was, according to the Tenth Circuit, "dictum," id. at 349, and not as persuasive as Justice Stevens's reading of the statute.5 But the Tenth Circuit's decision in Louisiana Pacific stands alone. The other circuit courts that have addressed the issue have been guided by the Sanabria majority.6 Moreover, the Seventh Circuit,

---

4. Justice Stevens argued that "[t]he statute does not refer to subunits of
an indictment or portions of a count but only to counts, a well-known and unambiguous term of art." 437 U.S. at 78. (Stevens, J., concurring) (internal quotations, brackets and citations omitted).

Justice Stevens spoke only for himself. Three members of the Court -- Justice White, who concurred, and Justice Blackmun and Justice (as he then was) Rehnquist, who dissented, did not undertake to parse S 3731. But, since none of the three Justices expressed reservations with respect to the jurisdiction of the First Circuit, whose decision the Court was reviewing, it would appear that all three, sub silentio, subscribed to the construction of S 3731 announced by Justice Marshall for the Court.
5. Following Justice Stevens's view that "count" is "a well-known and unambiguous term of art," the Tenth Circuit reasoned that "the language of S 3731 is unambiguous in referring to a count, and the statute's purpose to eliminate technical distinctions in pleadings does not give us license to ignore the section's plain language." Louisiana Pacific, 106 F.3d at 349. Nor, the court opined, could the provision of S 3731 directing that the statute be "liberally construed" mandate an interpretation "fundamentally inconsistent with its plain language." Id. (citations omitted). The Tenth Circuit thus concluded that "[i]t is not mere formalism, nor an irrational result, to require the government to plead allegations in separate counts, a minimal burden, in order to preserve its right to take an interlocutory appeal of the dismissal of such
counts." Id.

6. See United States v. Oakar, 111 F.3d 146, 149-150 (D.C. Cir. 1997); United States v. Hill, 55 F.3d 1197, 1199-1200 (6th Cir. 1995); United

which has had occasion to construe S 3731 subsequent to Louisiana Pacific, has expressly taken issue with the Tenth Circuit's analysis. Said the Seventh Circuit, speaking through Judge Easterbrook, in United States v. Bloom, 149 F.3d 649, 653 (7th Cir. 1998), "Sanabria's treatment of S 3731 was not dictum. It was no stray remark or aside. It explains the Court's rationale and thus is part of the holding." We agree.7

_____

States v. Levasseur, 846 F.2d 786, 788 (1st Cir. 1988), cert. denied 488 U.S. 894 (1988); United States v. Martin, 733 F.2d 1309, 1310 (8th Cir. 1984)(en banc), cert. denied sub nom. Eklund v. United States, 471 U.S. 1003 (1985); United States v. Marubeni America Corp., 611 F.2d 763, 764-765 (9th Cir. 1980); United States v. Albertini, 568 F.2d 617, 621 (2d Cir. 1977). The position of the Fifth Circuit is not entirely clear. Compare
United States v. Woolard, 981 F.2d 756, 757 (5th Cir.), reh'g denied, 990 F.2d 819 (5th Cir. 1993), with United States v. Terry, 5 F.3d 874, 876 (5th Cir. 1993).

7. Judge Easterbrook's explication of the integral role which the Sanabria Court's characterization of S 3731 played in its decision warrants quotation (149 F.3d at 653):

 The district court dismissed one theory of liability in an indictment;
  the prosecutor appealed; both the court of appeals and the Supreme
  Court concluded that S 3731 authorizes such an appeal if further
  prosecution would not be barred by the double jeopardy clause.
  Disagreeing with the court of appeals, the Supreme Court held that
  the double jeopardy clause did bar retrial. It was this additional
  conclusion that led the tenth circuit to call its treatment of S 3731
  dictum. But the Court reached the double jeopardy question only
  because its reading of S 3731 made it dispositive. Had the majority
  agreed with Justice Stevens about the meaning ofS 3731, it would
  have done as he urged: it would have ordered the appeal dismissed
  without turning to the Constitution. Longstanding practice calls for
  federal judges to explore all non-constitutional grounds of decision
  before addressing constitutional ones -- and especially to decide
  first whether any statute confers jurisdiction. See [United States v.
  Wilson, 420 U.S. 332, 336 (1975)]. See also Steel Co. v. Citizens for
  a Better Environment, ___ U.S. ___, 118 S.Ct. 1012-16, 140 L.Ed.2d
  210 (1998). That is what the Court did in Sanabria. It would make
  little sense to treat this wise effort to avoid constitutional issues as

an affront to Article III of the Constitution -- that is, as producing
only advisory opinions on the statutory issues....

7

What S 3731, as confirmed by Sanabria , contemplates is appellate review of a trial court order excising a portion of a count which, if not excised, would offer legal grounding for criminal culpability separate from whatever culpability might accrue from any portion or portions of the count that the trial court does not determine to be deficient as a matter of law.8 In the case at bar, the portion of count 140 excised by the District Court alleged the making by Frank Serafini of a false material declaration separate from the other false material declarations alleged against Frank Serafini by count 140 -- allegations which the District Court held to be properly cognizable as a matter of law. Given the separateness of the excised portion of count 140, we have appellate jurisdiction to review the District Court's excision order.

III

A. Serafini's Testimony

Turning to the substance of the government's appeal, we begin by laying out, in some detail, the relevant portions of Frank Serafini's testimony during his second appearance before the grand jury. That testimony began with various foundational matters, S. App. at 18-21, which included a denial by Serafini of being reimbursed for any political contributions.9 The questioning then turned to Serafini's

_____

8. Some circuit courts have employed the phrase"discrete basis for the imposition of criminal liability" to describe the separateness of the excised and non-excised portions of a count that is necessary to support appellate jurisdiction under S 3731. See Bloom, 149 F.3d at 653, and Oakar, supra, note 6, 111 F.3d at 149-50. While recognizing that the "discrete basis" formulation has appeared to be a serviceable shorthand in certain of the reported cases, we are not at this time fully persuaded that it adequately captures the many nuances thatS 3731 is likely to present. But this semantic question need not detain us in the case at bar: if it is assumed that "discrete basis" is a sufficiently capacious form
of words, the case at bar fits comfortably within it. Cf. Bloom, 149 F.3d at 653-54.

9.
    Q. And did you bring any documents pursuant to the subpoena
    that required your appearance here today?

relationship with Empire. S. App. at 22-44. Next, government counsel inquired about the contribution Serafini had made to the Dole campaign, including a question about Serafini's motive for contributing. 10 Counsel also asked whether Michael Serafini (Frank's nephew) had solicited the contribution and whether any others at Empire had solicited contributions from the defendant. S. App. at 47-50. Counsel next attempted to determine when and how Frank Serafini became aware of similar contributions to the Dole campaign by other members of the Serafini family.

_____

A. I don't have the documents, I don't have the documents with me but the subpoena, because the subpoena didn't require any. The way I read the subpoena, I have a copy of it, all documents relative
to political contributions you were reimbursed for, and I was not reimbursed for any contributions.

S. App. at 22-23.

10.
Q. Now, when we started out you talked to me about documents, that you didn't produce any because you weren't reimbursed for any contributions, that was your testimony. I want to show you two documents here and see if you can identify them. I am going to mark, the first one I will mark as 267 and the second one I will mark as 268. First let's start with 267. Can you identify that document?

A. That's a check to the Dole for President Campaign.

Q. And whose signature is on that check?

A. Mine.

***

Q. What prompted you on that occasion to contribute to Dole's campaign?

A. Well, prior to this I had also, this, my nephew asked me for this
check, for this particular check.

Q. Michael Serafini?

A. Right.

S. App. at 44-45.

9

At this point, counsel focused his questions on a $2,000 check from Michael Serafini[11] to Frank Serafini, inquiring whether that $2,000 check was a reimbursement for Frank Serafini's campaign contribution.[12] When the defendant

_____

11. The check in question was drawn on the account of Michael Serafini and Melinda Marcotte. However, for the sake of convenience it will be referred to as a check from Michael Serafini.

12.

Q. Let me show you a check that has been marked into evidence here, or I will mark it into evidence as 268, it is a check dated April 25th of `95, on the account of Michael Serafini and Melinda Marcotte, payable to you for $2,000. Now, I will show you --

A. I saw this check last time I was here.

Q. All right. Now, the reverse of the check also has a signature, is that your signature?

A. It is.

Q. Tell us when you first saw that check and what the circumstances were that you received it under?

A. I received this check the, probably the 25th and the circumstances, it is just a check, we, we frequently transfer money among our, you know, between ourselves. I would have assumed that this was for the repair of an automobile or something, that he lives in my home, a reimbursement for something.

Q. Who?

A. Michael.

Q. Michael lives in your home?

***

A. I have a home up in Covington that I don't, it was given to me by my father, Michael stays there.

Q. So, you don't live together?

A. No, but this check could have been for anything, I mean it could have been, at the time, if I recall, I was fixing his car, his transmission went in his car, I had his car repaired, it could have been for a stereo, it could have been for a bet he had taken, for a bunch of other things.

Q. It could have been for anything, it could have been for a trip to, a reimbursement for anything --

10

again denied being reimbursed, counsel asked if the fact that the check written to him was part of a series of checks -- all written on the same day and all for either $1,000 or $2,000 to various people from whom Michael Serafini had solicited contributions -- would prompt him to change his testimony about whether that $2,000 check he received was a reimbursement for his contribution. The defendant responded, "No. In my mind it was not a reimbursement."[13]

_____

A. Let's me say that.

Q. -- but my question is, was, isn't it a fact that that check was a direct reimbursement for your Dole contribution?

A. Absolutely not, in my mind. When he asks me for a thousand dollars for Bob Dole I would give it to him, I don't have to be reimbursed for that contribution. I gave to Bob Dole because I like Bob Dole.

Q. That's not my question.

A. The reimbursement, in my mind, was not, this was not a reimbursement in my mind, it just wasn't.

S. App. at 54-56.

13.
Q. Now, that check is 431, if I showed you a series of checks starting in the low 400's going to about 450, about 50 checks of which your check is in the middle?

A. Right.

Q. And they were all written to employees of Empire Sanitary Landfill, including the people you, family members that you just mentioned, Louis, Frances, Kimberly, John, all written on the same day, at or around the same time that Michael solicited contributions from all of those people, would you draw--

A. $2,000?

Q. Yes, $2,000, each check, would that change your testimony about whether or not, in your mind, this was a reimbursement for your political contribution?

A. No. In my mind it was not a reimbursement. I don't have to be reimbursed to contribute to Bob Dole, a republican candidate for president, I just don't have to be reimbursed for that.

S. App. at 56-57.

Counsel then inquired about checks from close relatives
of Serafini to the Dole campaign and checks from Michael
Serafini to those same persons.14 After the defendant denied

_____

14.

Q. So, it was totally coincidental that you, your father, Frances,
Kim and John, were all solicited on the same day for a contribution
and all received checks from Michael at or around the same period
of time, all dated the same day, for the exact amount, that was all
coincidental, that is your testimony as far as you know?

A. I am not aware of that.

***

Q. That is news to you, under oath, as you sit here today, that is
news to you?

A. That they were all reimbursed, yes, that is news to me.

Q. No, that they all received checks?

A. I know my father received a check, my sister I am not sure, I
have no idea what she received.

Q. What about Kim and John?

A. No idea. My father, I know, received a check, I am aware of that
--

***

Q. All right. We'll start with Frances Serafini, here is a check
dated
April 27th of '95.

A. Okay.

***

Q. I am going to show you a check from Michael Serafini and
Melinda Marcotte account to Frances Serafini for a thousand dollars
dated April 25th, check number 430. Okay. The check that was
made payable to you was dated April 25th, check 431, consecutively
numbered checks, correct?

A. Different amounts though.

Q. You said you wanted to see the checks?

A. Yeah, but I have never seen these checks, I have never, I am not

aware of them at all.

12

knowledge of many of the checks he was asked if, having been made aware of the existence of the checks, he still maintained that there was no connection between his contribution and the $2,000 check from Michael Serafini. When the defendant again denied any link, the disputed colloquy occurred:

Q: Is there any check that you received that reimbursed you other than that $2,000 check for your contribution.

A: No.

Q: Is there another check that you are aware of that is connected to this investigation, to this Dole contribution, other than the $2,000?

A: Not other than what you have shown me today, no.

_____

Q. Well, now you have, I am showing them to you. I am going to show you the one for your father. All right. Here is a check on Louis

Serafini's account, also dated April 27th for a thousand dollars to Dole for President. Right, so, now we have all three on April 27th payable to Dole. Here is a check on Michael and Melinda's account to your father, Louis. For a thousand dollars, this is check Number 429. So, now we have check 429, 430, and 431, all coming out of Michael's account for those amounts, correct?

A. Correct.

Q. Unfortunately I haven't brought all of thefiles here, but I am going to tell you, I am going to represent to you that I have a check

payable to Bob Dole from Kimberly and John Scarantino's account, and a similar check from Michael's account, for the same amount of money that they did it, in the same consecutive number that we have just seen here, within the same series of numbers. Now that you are aware of that, I am going to ask you again, in your mind, is there a connection between the check that you received and the contribution that you made to Dole?

A. In my mind?

Q. Yes?

A. The $2,000 check, no.

S. App. at 63-67.

13

Q: Did you receive any other money, whether by cash, or check, or any other form from Michael at or around the time period you made your Dole contribution other than this $2,000 check?

A: I can't specifically remember, however, we transfer money back and forth quite often for different reasons and I can't honestly say that there wasn't some kind of transfer, I mean, we do it all of the time.

S. App. at 67. (The disputed answer, reprinted here italicized, along with the question that triggered it, was referred to by the District Court as "statement 3," a convention that, for the sake of convenience and consistency, will be adopted here.) After the disputed colloquy, the defendant was shown a chart of checks written by Michael Serafini and asked if he could explain them.15 At that point, the questioning turned to other issues.

_____

15.
Q. I am going to show you an exhibit that has been marked into evidence as Grand Jury Exhibit 35. This is a chart of checks drawn on your nephew's account, Michael Serafini and Melinda Marcotte's account. It starts at check 426, and it goes to check 464, and there is a series of $1,000, $2,000 checks drawn to various individuals, do you see that?

A. Correct.

Q. Okay. First of all, let's go down the list and let me ask you do you recognize any of the names, do you know any of the individuals on the list?

A. My father, my sister, myself.

[Omitted: A discussion of who the various persons on the list were and how the defendant knew them.]

Q. All right. So, the [people on the list] you know basically were people that were affiliated with Empire?

A. Correct, most of them I know were affiliated with Empire.

Q. Right, now, your check here, this check 431, right?

A. Right.

14

The $2,000 check referred to by counsel in the
challenged question was the check from Michael Serafini to
Frank Serafini which, so the government believed, was to
reimburse Frank Serafini for his $1,000 campaign
contribution. At the time of this colloquy, government
counsel apparently had no clear idea why the
reimbursement check was for $2,000 rather than $1,000.
According to the government, its counsel only later

_____

Q. Frances is 430, Louis is 429, and Kim and John is 445, do you agree with me on that?

A. I do agree.

Q. At least that is what appears on this chart?

A. That is what is on that chart.

Q. And the chart indicates, at least, that between check 426 and check 464, there were a series of $1,000, $2,000 checks issued to these individuals --

A. Right.

Q. -- out of Michael's account?

A. Correct.

***

Q. Right, and do you know for a fact, or do you know that that is [Michael Serafini's secretary's] handwriting, that she made out all of the checks?

A. No, I didn't know that.

Q. Did you know that she made out all of the checks based on a list that Michael gave her of all of the people that had made contributions to Dole?

A. No, I do not know that.

Q. Now, having looked at that chart and seeing how your check is placed in there, is it your testimony that it is totally coincidental that your check is within a series of, this series of checks, and that it has nothing to do with the Dole, your Dole contribution?

A. Not in my mind it doesn't.

S. App. at 68-73.

15

acquired information that Serafini's aide, Thomas Harrison, also contributed $1,000 to the Dole campaign and was reimbursed by Michael Serafini through Frank Serafini for doing so. Thus, according to the government, (a) the $2,000 check from Michael Serafini served to reimburse both Thomas Harrison and Frank Serafini, but (b) the government did not know this at the time Frank Serafini answered the challenged question. It is the government's contention that -- contrary to the defendant's response ("Not other than what you have shown me today, no.") -- Frank was "aware of " two checks "other than the $2,000" that were "connected to this investigation, to this Dole contribution." One was a $1,000 check from Frank Serafini to Thomas Harrison, and the other was a $1,000 check from Thomas Harrison to the Dole campaign.

B. Discussion

When a district court rules that, as a matter of law, a question posed to a witness during his or her grand jury testimony cannot support an indictment for "false material declaration," our review is plenary. United States v. Lighte, 782 F.2d 367, 375 (2d Cir. 1986).

In evaluating statement 3, the District Court found that the context surrounding the disputed question established that the defendant could not have understood that he was being asked the "broad, open-ended question", Serafini, 7 F.Supp.2d at 541, that the government contends was intended; accordingly, the District Court concluded that statement 3 should be stricken from the indictment. The District Court reasoned that none of the questions either immediately before or after statement 3 raised any issue other than whether Frank Serafini "had personally received any other reimbursement checks in connection with his contribution to the Dole Committee." United States v. Serafini, 7 F.Supp.2d at 541. Immediately before asking the disputed question, "the prosecutor questioned Frank Serafini whether he received any reimbursement checks other than the $2,000 from . . . Michael Serafini." Id. at 541. After the disputed question, "there was no specific follow-up question to demonstrate the breadth of the prosecutor's inquiry." Id. at 541. Instead, the government

asked whether the defendant had "receive[d] any other money . . . from Michael at or around the time period" the defendant "made [the] Dole contribution." S. App. at 67. The District Court observed that "[the] follow up question demonstrates that the prosecutor and Frank Serafini were concerned only with whether he received other moneys or checks from defendant Michael Serafini, not whether Frank Serafini had solicited a check from someone else." Serafini, 7 F.Supp.2d at 541. The District Court, thus, held, with respect to the above line of questioning, that:

> When viewed in context, this single question cannot reasonably be expected to have triggered in the witness' mind an understanding that the government was inquiring of Frank Serafini's reimbursement of Mr. Harrison. The focus of the prosecutor's questions was on Frank Serafini's receipt of the check for $2,000 from Michael Serafini as reimbursement for Frank's Dole Committee contribution. In the context of this questioning, Frank Serafini could not reasonably be expected to understand that the prosecutor was asking a broad, open-ended question regarding checks from third parties to the Dole Committee.

Id., at 541 (emphasis in original).

The government now objects to the District Court's rulings on a variety of grounds. The government argues first that, in light of what it deems the unambiguous meaning of the disputed question, the District Court erred by looking to the context within which that question arose. The government contends that the District Court would only have been entitled to rely on the context had the question itself been inherently vague. We find this contention unpersuasive.

It is well-settled law that, in instances of some ambiguity as to the meaning of a question, "it is for the petit jury to decide which construction the defendant placed on the question." United States v. Ryan, 828 F.2d 1010, 1015 (3d Cir. 1987); accord United States v. Reilly 33 F.3d 1396, 1414 (3d Cir. 1994). However, "these general rules are not without limit . . . ." Ryan, 828 F.2d at 1015. One such limit is that an "excessively vague or fundamentally ambiguous"

17

question may not form the predicate to a perjury or false statement prosecution. Id. (quotations and citations omitted). We have said that a question is "not amenable to jury interpretation," id., "when it is entirely unreasonable to expect that the defendant understood the question posed to him," id. (quotations and citations omitted). In the present case, the government contends that "none of the broad terms used in the question rendered it fatally ambiguous." Government's Brief at 29. The question -- awkwardly phrased though it is -- might, standing alone , be thought as a matter of syntax not to be fatally ambiguous. The problem is that, read in context, the question takes on a particular meaning wholly at odds with the "broad, open-ended" significance the government now seeks to attribute to it.

In Fotie v. United States, 137 F.2d 831, 842 (8th Cir. 1943), the Eighth Circuit, per Judge Riddick, in reversing a perjury conviction, admonished that "[a] charge of perjury may not be sustained by the device of lifting a statement of the accused out of its immediate context and thus giving it a meaning wholly different than that which its context clearly shows." That formulation has become an established principle of law. See United States v. Cook, 497 F.2d 753, 764 (9th Cir. 1972) (Ely, J., dissenting) dissenting opinion reinstated as majority opinion in relevant part, 498 F.2d 286 (9th Cir. 1973); Van Liew v. United States, 321 F.2d 674, 677–678 (5th Cir. 1963); Brown v. United States , 245 F.2d 549, 556 (8th Cir. 1957); United States v. Geller, 154 F.Supp. 727, 730 n. 3 (S.D.N.Y. 1957). In Van Liew, the Fifth Circuit, quoting Fotie, put the matter as follows:

> The seriousness of the crime of perjury and the fact that it turns finally on the subjective knowledge and purpose of the swearer require that the Government not be allowed to predicate its case upon the answer to a single question which in and of itself may be false, but which is not shown to be false when read in conjunction with testimony immediately preceding and following the alleged perjured statement. The oft-quoted [Fotie] rule is applicable here. `A charge of perjury may not be sustained by the device of lifting a statement of the accused out of its immediate context

> and thus giving it a meaning wholly different than that
> which its context clearly shows.'

Van Liew, 321 F.2d at 677 (quoting Fotie , 137 F.2d 831,
842 (8th Cir. 1943)).

This court endorsed the Fotie rule in United States v.
Tonelli, where we discussed the proper role of context in
assessing the meaning of questions posed to a witness
during grand jury proceedings. 577 F.2d 194, 198 (3d Cir.
1978). In that case, the defendant, Tonelli, was asked about
his participation in the placement of certain pension funds.
Id. at 197. Although initially denying participation in the
placement of those funds, when further questioning
revealed that the government included in the notion of
participation, "recommendations for someone to place any
moneys in a particular bank," the defendant "explained that
he had introduced his cousin" to persons involved in the
placement of those moneys. Id. We found that"by quoting
a question and answer in isolation, the indictment did not
accurately represent the statements made by the defendant
and in ignoring the qualifying definitions used by the
prosecutor, it was misleading." Id. at 198. Affirming the
Fotie principle, we held the indictment defective. Id.

As our holding in Tonelli demonstrates, the meaning of
individual questions and answers is not determined by
"lifting a statement . . . out if its immediate context," when
it is that very context which fixes the meaning of the
question. Id. In the present case, the government
acknowledges "that the two surrounding questions dealt
with . . . whether Serafini was reimbursed for his Dole
contribution." Government's Brief at 32. The government
argues, however, that the narrow subject matter of the
antecedent and subsequent questions "does not restrict the
meaning of the question and answer sandwiched in
between because that question and answer plainly
concerned a different topic, the broader category of checks,
other than the suspected $2,000 check, that may have been
connected to the grand jury's investigation." Id. (emphasis in
original). But the text of the "sandwiched" question, read in
isolation as the government would have it read, hardly
demonstrates that the question "plainly concerned a
different topic," let alone serves to define that "different

19

topic." The question inquired whether the witness was "aware" (itself a word of somewhat uncertain connotation) of "another check that is connected to this investigation, to this Dole contribution, other than the $2,000." Two aspects of the question are immediately apparent. The first is that the question is marked by an awkward appositional structure -- "another check . . . connected to this investigation, to this Dole contribution" -- likely to obscure its meaning. The second is that determining the question's meaning cannot be accomplished by reading the question in isolation from the setting in which it was asked. In asking Serafini whether he was "aware" of "another check . . . connected to this investigation," counsel might be thought to have been directing Serafini to think at large about all he had been asked. However the comprehensive phrase "connected to this investigation" was immediately narrowed through the awkward appositional device to "connected to this Dole contribution," a phrase which necessarily called on Serafini to focus on the immediately antecedent questions. And that focus was only sharpened by the phrase of exclusion, "other than the $2,000," with which counsel concluded the question. In undertaking to inject into the question sufficient intelligibility so that he could reply, Serafini was required by the question to treat the question as referentially sequential to questions he had just answered. This, in short, is an instance in which a court "must look to the context of the defendant's statement to determine whether the defendant and his questioner joined issue on a matter of material fact to which the defendant uttered a false material declaration." United States v. Sainz, 772, F.2d 559, 562 (9th Cir. 1984). Since the context of the disputed question demonstrates that government counsel had been seeking information regarding Michael Serafini's reimbursement activities, the question cannot support the limitlessly capacious construction the government would have it bear.

In the alternative, the government argues that, if turning to the context was appropriate, the District Court erred by concentrating on the immediate context of the question. The government contends that an examination of the broader context supports its interpretation of the question. Appellant's Brief at 34. In support of this contention, the

20

government points out that: (1) prior to the disputed colloquy the defendant was shown several checks from 653<!>various persons to the Dole campaign and several

apparently corresponding checks from Michael Serafini to those individuals, and (2), following the disputed colloquy the defendant was shown a chart listing sequentially numbered checks, drawn on Michael's account, all for either $1,000 or $2,000, to various individuals, most of whom were associated with Empire. Accordingly, in the government's view, since "[t]he prosecutor . . . referenced numerous other checks that were suspected to have reimbursed the conduits for their contributions," "it was clear to Serafini, from the context, that the question which led up to false statement 3 was not just concerned with checks that reimbursed him, but other checks connected to the investigation." Appellant's Brief at 34-35.

Close examination of the broader context relied on by the government does not, however, lend strength to the government's open-ended construction of the disputed question. Prior to statement 3, the defendant was shown a set of consecutively numbered checks drawn on Michael Serafini's account: one payable to the defendant's sister, one payable to the defendant himself, and one payable to his father. See supra note 11. The defendant was then told that the government had "a check payable to Bob Dole from [the defendant's niece and nephew], and a similar check from Michael's account, for the same amount of money that they did it, in the same consecutive number that we have just seen here, within the same series of numbers." S. App. at 67. Immediately after being shown and told about these checks, the defendant was asked "Now that you are aware of that, I am going to ask you again, in your mind, is there a connection between the check that you received and the contribution that you made to Dole?" S. App. at 67. The government, in this exchange, was focusing on whether Frank Serafini had been reimbursed by Michael Serafini, not on whether Frank Serafini had, himself, reimbursed others. A similar pattern is evident in the questions put to the defendant, subsequent to statement 3, about the chart of checks. See supra note 12. That chart was a listing of consecutively numbered checks, drawn on Michael Serafini's account, allegedly paid out as reimbursements for

21

contributions to the Dole committee. After being shown the chart, the defendant was asked whether he recognized the names of the payees, and, after a discussion of who the various payees were and how he knew them, the defendant was asked "Now, having looked at that chart and seeing how your check is placed in there, is it your testimony that it is totally coincidental that your check is within a series of, this series of checks, and that it has nothing to do with the Dole, your Dole contribution?" The defendant responded, "Not in my mind it doesn't." S. App. at 73. Here, again, the focus was on whether Michael Serafini had reimbursed the defendant for his contribution to the Dole committee. Nothing in the exchange suggests that counsel or the defendant had in mind reimbursement checks written by Frank Serafini. The issue of whether the defendant was cognizant of additional checks –– whether reimbursement checks not written by Michael Serafini, or campaign contributions not made by Frank Serafini–– was never joined.

Finally, the government argues that "[t]he District Court . . . attempted to shoe-horn this case into the[United States v. Slawik, 548 F.2d 75 (3d Cir. 1977)], Tonelli line of cases by criticizing the prosecutors for not asking more direct questions . . . ." Appellant's Brief at 35. The suggestion that the District Court erroneously relied on Slawik is unconvincing. Slawik is not cited in the course of the District Court's discussion of statement 3. Serafini, 7 F.Supp.2d at 540-542. The District Court did, however, reason that "[t]he prosecutor could have asked Frank Serafini whether he had ever solicited or reimbursed another person for contributions to the Dole Committee and whether any checks existed to evidence such actions." Id. at 541. Finding that "these simple and straight-forward questions, which would have extinguished any potential ambiguity, were never asked," id., the District Court concluded that "[t]he prosecutor plainly led Frank Serafini to understand that he was being questioned as to whether he had personally received any other reimbursement checks in connection with his contribution to the Dole Committee." Id. We agree with the District Court.

In Bronston v. United States, 409 U.S. 352 (1973), the

22

unanimous Supreme Court discussed authoritatively the basic principles governing perjury prosecutions. In that case, the Court, speaking through Chief Justice Burger, held that 18 U.S.C S 162116 did not reach a defendant who provided a literally true but unresponsive answer while testifying as a witness at a bankruptcy hearing. Id. at 359, 361-362. Cf. United States v. DeZarn, 157 F.3d 1042, 1043 (6th Cir. 1998) (upholding a perjury conviction, under 18 U.S.C. S 1621, when the defendant's testimony"can reasonably be inferred to be knowingly untruthful and intentionally misleading, even though the specific question to which the response is given may itself be imprecise."). In the course of its opinion, the Court in Bronston drew upon the history of the crime of perjury. First, referring to the in-depth Study of Perjury prepared by the New York Law Revision Commission and submitted to the New York Legislature in 1935, the Court observed:

> The seminal modern treatment of the history of the offense concludes that one consideration of policy overshadowed all others during the years when perjury first emerged as a common-law offense: "that the measures taken against the offense must not be so severe as to discourage witnesses from appearing or testifying."

Id. at 359.17 Next, the Bronston Court invoked both
(Text continued on page 25)

_____

16. Although decided under 18 U.S.C. S 1621, Bronston sets forth underlying principles that apply to any perjury or false material declaration prosecution. See supra note 2.

17. In transmitting to the New York Legislature its Study of Perjury, the Law Revision Commission recommended amending the perjury provisions of the New York's Penal Law with two ends in view:

> The Commission is impressed by the evidence showing that materiality is an inherently ambiguous term, that the courts have given it the widest variety of meanings, that it probably came into the law through misconception, and that by construction it has been largely whittled away in the country of its origin. Nevertheless, the fact is recognized that materiality has become deeply imbedded in the judicial and professional consciousness of this state; that it cannot, therefore, be easily eliminated from our law. Believing, however, that materiality as now defined by interpretation is a

23

serious impediment to effective prosecution for perjury, and that it discourages even the initiation of prosecutions, the Commission favors the addition of a degree of perjury from which the materiality element is eliminated. It believes the that the mere fact of classifying the crime in general accord with the seriousness of the falsehood uttered -- at the same time making it plain to the jury than any intentional falsehood in a judicial or similar official proceeding is a crime -- will facilitate a finding of guilt for the lesser offense. The classification proposed still preserves the chance of conviction and severe punishment in an unusual and egregious case. The addition of this second degree will also cover those cases in which false swearing is wilfully and knowingly committed in what at the time is believed to be a material matter and with a deliberate intent to defeat the ends of justice although not technically material within the rules of law.

The Commission is impressed by the weight and variety of statistical and other evidence adduced for the conclusion that the present maximum penalty of twenty years imprisonment is altogether too severe and that this circumstance also stands in the way of effective prosecution. Reduced penalties and the alternative of a fine for the second degree are accordingly recommended.

To accomplish these ends, the Commission submitted a draft bill, which, in the spring of 1935, the Legislature adopted and Governor Lehman signed into law. L. 1935, ch. 632.

Since 1935, New York's law of perjury has evolved further -- from a two-tiered to a three-tiered structure. Perjury in the third degree, a misdemeanor, is "swear[ing] falsely." N.Y. Penal Law S 210.05. One "swears falsely" when one "intentionally makes a false statement which [one] does not believe to be true (a) while giving testimony, or (b) under oath in a subscribed written instrument." N.Y. Penal Law S 210.0. "It should be here noted that materiality is not one of the requiste elements of the crime of perjury in the third degree..." People v. Tyler, 405 N.Y.S.2d, 270, 275 (App. Div. 2d Dept.), affirmed 413 N.Y.S.2d 295 (1978). Perjury in the second degree, a felony, consists of "swear[ing] falsely" when one's "false statement is (a) made in a subscribed written instrument for which an oath is required by law, and (b) made with intent to mislead a public servant in the performance of his official functions, and (c) material to the action, proceeding or matter involved." N.Y.Penal Law S 210.10. Perjury in the first degree -- a higher degree felony -- involves "swear[ing] falsely" when one's "false statement (a) consists of testimony, and (b) is material to the action, proceeding or matter in which it is made." N.Y.Penal Law S 210.15.

Wigmore and Montesquieu. And then the Court turned to the pertinent federal case law. "The cases support the petitioner's position that the perjury statute is not to be loosely construed, nor the statute invoked simply because a wily witness succeeds in derailing the questioner-- so long as the witness speaks the literal truth." Id. at 360.18 Importantly, for our purposes, the Bronston Court continued, "[t]he burden is on the questioner to pin down the witness to the specific object of the questioner's inquiry." Id. Thus, Bronston stands for the proposition that "[p]recise questioning is imperative as a predicate for the offense of perjury." Id., at 362.

Accepting arguendo the government's claim that the disputed question was intended as an "unspecific question," we nonetheless see the lack of specificity as a form of imprecision whose "consequences . . . must be laid at the table of the questioner, not the questioned." Sainz, 772 F.2d at 563. To the extent that, as Chief Justice Burger concluded in Bronston, "precise questioning is imperative as a predicate for the offense of perjury," that required predicate is lacking with respect to the disputed question put to Frank Serafini. We conclude, as did the District Court, that the context within which statement 3 was offered shows that Frank Serafini understood that he was being asked whether, in connection with his contributions to the Dole campaign, he had received any reimbursement checks from Michael Serafini other than the $2,000 check. As there is no allegation that -- with the question so understood -- the defendant's answer was false, that sub-portion of the indictment pertaining to statement 3 was rightly stricken.

Accordingly, the judgment of the District Court will be affirmed.19

_____

18. Among the cases cited by the Bronston Court was this court's decision in United States v. Slutzky, 79 F.2d 504 (3d Cir. 1935).
19. This court's affirmance of the judgment of the District Court is not to be taken as reflecting any view on the issues referred to by the government at page 3, footnote 1, of its letter brief of May 8, 1998. Any such issue that remains after this case returns to the District Court may be addressed by that court.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit