**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 13-1766, 13-1767, 13-1768
_____

UNITED STATES OF AMERICA

v.

CHRISTOPHER G. WRIGHT,
Appellant in 13-1766


UNITED STATES OF AMERICA

v.

RAVINDER S. CHAWLA,
Appellant in 13-1767


UNITED STATES OF AMERICA

v.

ANDREW TEITELMAN,
Appellant in 13-1768
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

(D.C. Criminal Nos. 2-08-cr-00450-001; 2-08-cr-00450-002; 2-08-cr-00450-004)

District Judge: Honorable Eduardo C. Robreno
_____

Argued October 1, 2014
_____

Before: AMBRO, CHAGARES, and VANASKIE, *Circuit Judges*

(Opinion Filed: January 8, 2015)

Jennifer A. Williams, Esq. [*ARGUED*]
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
    *Counsel for Appellee*

Lisa A. Mathewson, Esq. [*ARGUED]*
Suite 810
123 South Broad Street
Philadelphia, PA 19109
    *Counsel for Appellant Christopher G. Wright*

Ellen C. Brotman, Esq.
Montgomery, McCracken, Walker & Rhoads
123 South Broad Street
28th Floor
Philadelphia, PA 19109
    *Counsel for Appellant Andrew Teitelman*

Peter Goldberger, Esq.
50 Rittenhouse Place
Ardmore, PA 19003

Megan S. Scheib, Esq.
William J. Winning, Esq.
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
    *Counsel for Appellant Ravinder S. Chawla*

——————

OPINION OF THE COURT

——————

VANASKIE, *Circuit Judge.*

Appellants Christopher G. Wright, Ravinder S. Chawla, and Andrew Teitelman filed this interlocutory appeal from the District Court's denial of their pretrial joint motion to preclude the Government from relitigating certain issues under the Double Jeopardy Clause and from constructively amending the indictment. Because the District Court's ruling is not a "collateral" order subject to immediate review under *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949), and was not otherwise a "final decision[]" under 28 U.S.C. § 1291, we lack jurisdiction to consider their appeal. Accordingly, we will dismiss this appeal and remand for further proceedings.

I.

We have already had occasion to describe the facts underlying this case in *United States v. Wright*, 665 F.3d 560 (3d Cir. 2012), and that description of the facts is important for understanding the matter before us now:

> From 2005 through 2007, Wright was Chief of Staff to Philadelphia City Councilman John "Jack" Kelly. Wright was also a realtor. Chawla owned the real estate firm World Acquisition Partners ("World Acquisition"), and

Teitelman, an attorney, did most of the firm's legal work. Teitelman was not a World Acquisition employee, but his offices were in its office suite, and most of his work came from World Acquisition. Chawla and Teitelman befriended Wright when Wright had an office in the same building.

This case concerns a series of gifts that Chawla, Teitelman, or both gave Wright and a simultaneous series of official acts that Wright took on behalf of World Acquisition. Wright received a free stint in an apartment, free legal services, and was promised commissions on World Acquisition deals. At the same time, Wright shepherded a bill that Chawla favored through Kelly's office, arranged meetings about a World Acquisition development, and communicated with City of Philadelphia offices for World Acquisition.

More specifically, Wright received three main benefits. First, he lived at least part-time in an apartment (with a free parking space) for 14 months without

paying rent. World Acquisition had contracted to buy a building at 2000 Delancey Street in Philadelphia, then sold its right to buy the building to another purchaser. Meanwhile, Wright was in divorce proceedings and struggled with alcohol abuse. Teitelman, concerned for Wright, helped him move into one of the building's vacant units. The parties contest the extent to which Chawla knew about this arrangement. The new purchaser's agent soon discovered Wright, who left the apartment months later after the new purchaser sought to evict him.

Second, Wright received free legal help from Teitelman and his associate. When the Delancey Street building's new owner attempted to evict Wright, Teitelman defended him. Teitelman also took over negotiations with the lawyer for Wright's wife when Wright could no longer afford his previous divorce lawyer. Finally, Teitelman defended Wright in a bank foreclosure against Wright's marital home. For all that work,

Teitelman billed Wright but $350, and did so only after Teitelman learned that the FBI was investigating their relationship. As with the apartment, the parties contest Chawla's involvement.

Third, Wright was promised commissions in his capacity as a realtor. He occasionally "brought deals" to World Acquisition in the same manner that any realtor could, but none of those deals succeeded, so Wright never earned anything. On one occasion, World Acquisition granted Wright and his partner the exclusive right to approach a buyer for a $100 million property. Had Wright succeeded in making the sale, he would have earned a commission of $6 million, but that deal also fell through. Chawla offered Wright "liaison work" as well, but Wright declined that offer.

While he was receiving those benefits, Wright took three sets of actions as Councilman Kelly's Chief of Staff that tended to benefit World Acquisition. First, Wright helped Kelly propose and pass a "mechanical parking"

ordinance. Philadelphia law required developers planning to install mechanical parking to get a zoning variance, a time-consuming process. At Teitelman's behest, Wright set up a meeting at which Chawla and his partner suggested that Kelly change that law. Kelly, who usually took a pro-development stance, agreed. Chawla and Teitelman prodded Wright to make the bill a priority, and Kelly soon after introduced the bill. The City Council passed it by a vote of 15–0.

Second, Wright helped Chawla oppose an ordinance that would cripple a planned World Acquisition project. Chawla envisioned a large development called "River City" south and west of Philadelphia's Logan Square, where low-rise residences predominate. When the neighborhood association protested, Wright arranged a meeting between Chawla and association leaders. Afterward, Wright wrote Chawla and Teitelman advising that his "role as Jack's Chief of Staff" should

be to focus City staff on River City's benefits. Nonetheless, in the face of continued opposition, the City Council passed a building-height restriction that thwarted the River City plans. Kelly joined the 15–0 vote.

Third, Wright worked with other City offices on World Acquisition's behalf. When the Parking Authority was selling a certain property, Wright forwarded public information about its "request for proposal" process to Chawla and Teitelman. Wright also arranged a walkthrough of the property. He obtained public information for World Acquisition from Philadelphia Gas Works through a high-level official rather than through the main call center. Finally, Wright worked with the City's Department of Licenses and Inspections on a certification that the River City property was not encumbered with zoning violations. City Council staff often did so for their constituents, though this certification was unusually complicated.

In 2008, a federal grand jury returned a fourteen-count indictment against Chawla, Teitelman, Wright, and Chawla's brother Hardeep. The indictment charged honest services fraud, traditional fraud, conspiracy to commit both kinds of fraud, and bribery in connection with a federally funded program. After a four-week jury trial, including five days of deliberations, the jury convicted Chawla, Teitelman, and Wright on three counts: (1) conspiracy to commit honest services and traditional fraud (Count One); (2) honest services fraud for the apartment arrangement (Count Ten); and (3) traditional fraud for the apartment arrangement (Count Twelve). The jury further convicted Chawla alone on one honest services count for offering Wright liaison work (Count Three). It acquitted on the other ten counts and acquitted Hardeep Chawla of all counts.

The District Court sentenced Wright to 48 months' imprisonment, Chawla to 30 months, and Teitelman to 24

10

> months, followed in each case by two years of supervised release. It also imposed fines and special assessments on each person.

*Id.* at 564–67.

Wright, Teitelman, and Chawla appealed their convictions. *See generally id.* Their primary argument on appeal was that the intervening decision in *Skilling v. United States*, 561 U.S. 358 (2010)—establishing that the federal honest-services fraud statute, 18 U.S.C. § 1346, criminalized only fraudulent schemes based on bribery or kickbacks—undermined the validity of their convictions. We agreed that Appellants' convictions for honest-sevices fraud on Counts One, Three, and Ten may have been predicated on a now-impermissible theory of liability, and thus vacated those convictions and remanded for a new trial. Because prejudicial spillover may have tainted the traditional fraud convictions on Count Twelve, those convictions too were vacated.

On remand, Appellants filed a joint motion under the Double Jeopardy Clause to limit the scope of the new trial, "to prevent relitigation of issues that were necessarily decided in their favor when the jury acquitted them on several counts." Appellants' Br. at 4. Appellants also sought to bar certain arguments from the Government that they believed would constructively amend the indictment. In an order filed on February 4, 2013, followed by an accompanying memorandum on April 5, 2013, the District Court denied the motion except as to evidence of a $1000 check paid to Wright by Hardeep Chawla (the only defendant acquitted of all

11

charges). *United States v. Wright*, 936 F. Supp. 2d 538 (E.D. Pa. 2013).[1]  Appellants timely appealed.

## II.

Although our jurisdiction over substantial aspects of this appeal is not contested, we have an independent duty to ascertain whether we do indeed have jurisdiction. *See Metro Transp. Co. v. N. Star Reinsurance Co.*, 912 F.2d 672, 676 (3d Cir. 1990) ("Where counsel has not satisfied us that jurisdiction is present, we are obliged to raise that issue on our own initiative.").  Our review of this threshold question is, of course, plenary. *In re Blatstein*, 192 F.3d 88, 94 (3d Cir. 1999).

---

[1] Also on remand, the Government and Appellants attempted to enter into plea agreements under Rule 11(c)(1)(C), under which Chawla and Teitelman would plead guilty to a misdemeanor conspiracy to defraud the Department of Housing and Urban Development, while Wright would plead guilty to being an accessory after the fact to that offense, all with promised sentences of time served.  In March 2013, the District Court rejected the pleas as "too lenient in light of the seriousness of the charged crimes" and "contrary to the public interest." *United States v. Wright*, 291 F.R.D. 85, 90 (E.D. Pa. 2013).  The parties do not appeal that order.

III.

A.

The principal statutory basis for our jurisdiction over appeals taken by criminal defendants is 28 U.S.C. § 1291, which permits us to review almost all "final decisions" of the federal district courts. This "final judgment" rule ordinarily "prohibits appellate review until conviction and imposition of sentence" in a criminal case. *Flanagan v. United States*, 465 U.S. 259, 263 (1984) (citations omitted). At issue here is the collateral-order exception announced in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949), which gives us latitude to exercise immediate review over orders that, although not "final" in the traditional sense, "conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and [are] effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978) (citations omitted).

Time and again, the Supreme Court has reiterated the limited nature of this doctrine:

> [W]e have not mentioned applying the collateral order doctrine recently without emphasizing its modest scope. *See, e.g.*, *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994) ("[T]he 'narrow' exception should stay that way and never be allowed to swallow the general rule that a party is

13

> entitled to a single appeal, to be deferred until final judgment has been entered . . . ." (citation omitted)). And we have meant what we have said; although the Court has been asked many times to expand the "small class" of collaterally appealable orders, we have instead kept it narrow and selective in its membership.

*Will v. Hallock*, 546 U.S. 345, 350 (2006). This admonition holds special significance in criminal cases, where we must apply the collateral-order exception "with the utmost strictness," *Flanagan*, 465 U.S. at 265, primarily "to avoid delays due to piecemeal appellate litigation, as these delays may work to the detriment of the rights of the defendant or prejudice the prosecution's ability to prove its case." *United States v. Wecht*, 537 F.3d 222, 244–45 (3d Cir. 2008) (citations omitted). Such appeals are thus permitted "only in the most rare and exceptional circumstances." *Id.* at 245 (citing *Flanagan*, 465 U.S. at 270).

One such exceptional circumstance is sometimes presented by a district court's denial of a colorable claim under the Double Jeopardy Clause. *See Abney v. United States*, 431 U.S. 651, 662 (1977). The rationale is that the Clause, which states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb," U.S. Const. amend. V, protects a defendant not only from being convicted *after* a second trial on the same offense, but also from suffering the burden of a second trial itself. *See Abney*, 431 U.S. at 660–62. Once that second trial has occurred, whether the defendant has been convicted or acquitted, full

post-trial relief is impossible. Thus, where a double-jeopardy claim is "effectively unreviewable" after trial under *Cohen*, the collateral-order doctrine permits interlocutory review.

Appellants' argument rests upon the Double Jeopardy Clause's incorporation of the doctrine of collateral estoppel, also known as issue preclusion, which "can bar the relitigation of an issue actually decided in a defendant's favor by a valid and final judgment." *United States v. Merlino*, 310 F.3d 137, 141 (3d Cir. 2002) (citing *Ashe v. Swenson*, 397 U.S. 436, 443 (1970)). In a recent en banc opinion, we explained that a defendant who seeks to avail himself of collateral estoppel bears the "heavy burden" of "demonstrating that the issue he seeks to foreclose was actually decided in the first proceeding." *United States v. Rigas*, 605 F.3d 194, 217 (3d Cir. 2010) (en banc) (citations omitted).

## B.

The first substantial question presented by this appeal is whether the District Court's denial of Appellants' motion to preclude based on collateral estoppel justifies interlocutory appeal under *Cohen* and *Abney*. It is undisputed that where collateral estoppel bars "retrial of a charge," a defendant may seek immediate review. *United States v. Levine*, 658 F.2d 113, 125 (3d Cir. 1981) (citing *United States v. Venable*, 585 F.2d 71, 75 (3d Cir. 1978)). But we have expressed doubt that such jurisdiction exists "when the collateral estoppel claim would at most suppress some evidence but not preclude trial on the charge." *Id.* at 125 n.22 (citing *United States v. Mock*, 604 F.2d 336, 337–41 (5th Cir. 1979)). The root of that concern stems from *Abney* itself, in which the Supreme

Court announced a critical distinction between allegations of constitutional injury and mere evidentiary error:

> [T]he very nature of a double jeopardy claim is such that it is collateral to, and separable from the principal issue at the accused's impending criminal trial, i.e., whether or not the accused is guilty of the offense charged. In arguing that the Double Jeopardy Clause of the Fifth Amendment bars his prosecution, the defendant makes no challenge whatsoever to the merits of the charge against him. Nor does he seek suppression of evidence which the Government plans to use in obtaining a conviction. Rather, he is contesting the very authority of the Government to hale him into court to face trial on the charge against him.

431 U.S. at 659 (citations omitted).

Based on that reasoning, seven of our sister courts of appeals have found that the touchstone for interlocutory jurisdiction is a collateral-estoppel claim that, if successful, would require dismissal of, at a minimum, an entire count. *See United States v. Wittig*, 575 F.3d 1085, 1096 (10th Cir. 2009); *United States v. Ginyard*, 511 F.3d 203, 211–12 (D.C. Cir. 2008); *United States v. Tom*, 787 F.2d 65, 68 (2d Cir.

16

1986); *United States v. Gulledge*, 739 F.2d 582, 586–87 (11th Cir. 1984); *United States v. Head*, 697 F.2d 1200, 1205 (4th Cir. 1982); *United States v. Powell*, 632 F.2d 754, 758 (9th Cir. 1980); *Mock*, 604 F.2d at 339–40. None of our sister circuits or the federal district courts appear to have taken a contrary view.

Here, Appellants were convicted at trial, by a general verdict, of conspiracy to commit honest-services fraud under Count One. They were acquitted, with the exception of Chawla on Count Three, on several substantive counts of mail and wire fraud, each predicated on a mailing or email relating to a particular transaction. These include Count Two (the mechanical-parking ordinance); Counts Three through Five (the River City development project); Counts Six and Seven (the Parking Authority property); Counts Eight and Eleven (the free legal services regarding Wright's divorce proceedings and a home foreclosure action); and Count Nine (the corporate tax bill). Appellants now argue that the jury necessarily decided that Appellants lacked criminal intent as to the entirety of their conduct with respect to those transactions. Thus, as a matter of collateral estoppel, they contend that the Government must be precluded from introducing any evidence of those transactions, whether to prove criminal intent as to Count One or to prove an overt act in furtherance of the conspiracy charged in that count.

According to the consensus view outlined above, the foremost question is whether this claim, if successful, would require dismissal of the indictment as a whole, or, at a minimum, dismissal of any single count. In its briefing, the Government notes that criminal intent is an essential element of each of the remaining counts, and that trial "could not proceed if the Government were barred by collateral estoppel

17

from presenting evidence of criminal intent." Appellee's Br. at 35–36. By that reasoning, the Government believes that we have jurisdiction to review at least this facet of the District Court's order now rather than after trial.

The Government's theory of jurisdiction is incorrect: Appellants did not seek to preclude the Government from introducing any and all evidence pertaining to criminal intent—nor could they have, given that the jury necessarily found that such intent existed with respect to the counts of conviction. Instead, Appellants seek to preclude the Government from using only the transactions underlying the acquitted counts as evidence of intent.

Appellants themselves concede that their motion, if granted, would not require dismissal of Count One, or of any other particular count in its entirety. *See* Appellants' Br. at 16 ("Thus, even if the [motion to preclude] had been fully granted, at least one count would have been left untouched (that is, Count 12, as to all defendants; and Count 3, as to Chawla alone), and Count One, the multi-faceted conspiracy count, would only be narrowed."). And during oral argument before the District Court, counsel for Appellant Wright, arguing on behalf of all Appellants for purposes of their joint motion to preclude, noted that even if Appellants prevail on their double-jeopardy claim, they would still face trial on Count One, because the Government could still introduce other evidence of criminal intent, such as Wright's use of the Delancey Street Apartment:

> MS. MATHEWSON: . . . Speaking only to honest services, Your Honor, [the Government is] perfectly welcome to retry a

18

bribery case that says . . . we exchanged L&I certs, PGW, whatever official action we haven't already been acquitted on for the things of value we haven't been acquitted on, the free apartment and parking space and the legal services on the eviction. That's their case, Your Honor.

We're not saying throw them out of court as a result of double jeopardy. . . . But, Your Honor, we have to go back to the heart of the double jeopardy clause, which is, let's not have a deja vu trial. Let's not have another case where we're fighting the exact same issues that a jury has already acquitted us on.

(App. 240.)

Under the rule adopted by our sister circuits, then, we are foreclosed from considering the merits of this appeal. Appellants claim, however, that *United States v. Serafini*, 167 F.3d 812 (3d Cir. 1999), commands a different result. In *Serafini*, we addressed the scope of the then-current version of 18 U.S.C. § 3731,[2] which permits the Government to seek

_____

[2] At the time, the statute stated, in pertinent part:

19

interlocutory appeal from certain pre-trial orders of dismissal. We concluded that along with permitting an appeal from the dismissal of an *entire* count, the statute also authorized the Government's appeal from an order "excising a *portion* of a count which, if not excised, would offer legal grounding for criminal culpability separate from whatever culpability might accrue from any portion or portions of the count that the trial court does not determine to be deficient as a matter of law." *Id.* at 816 (emphasis added). We based this holding on guidance from the Supreme Court in *Sanabria v. United States*, 437 U.S. 54 (1978), where the Court noted that § 3731

> In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information or granting a new trial after verdict or judgment, as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.
>
> . . .
>
> The provisions of this section shall be liberally construed to effectuate its purposes.

18 U.S.C. § 3731 (1994).

was "expressly designed to eliminate '[t]echnical distinctions in pleadings as limitations on appeals by the United States.'" *Id.* at 69 n.23 (quoting H.R. Conf. Rep. No. 91–1768, p. 21 (1970)).[3]

Appellants argue that the definition of a "count" we adopted in *Serafini* with respect to that term's use in § 3731 is also binding here. In other words, they believe that, for double-jeopardy purposes too, we should define a "count" not based on the Government's strategic choices at the pleadings stage but rather in functional terms as any separate "legal grounding for criminal culpability." By that view, our sister circuits have all adopted an unduly narrow interpretation of *Abney*, and the correct reading would permit interlocutory review where the defendant's motion raises a colorable claim that any particular legal grounding for culpability is barred by collateral estoppel.

Applying that theory to these facts, Appellants argue that the transactions they seek to preclude—the River City deal, the mechanical parking ordinance, and so on—each provide a separate "legal grounding for criminal culpability" on the conspiracy charge in two respects. First, the conduct underlying any one of these transactions would arguably be sufficient to establish the element of criminal intent. Second, each transaction arguably provides a separate and adequate basis for the overt-act element. *See United States v. Rankin*,

---

[3] Congress later amended § 3731, essentially codifying *Sanabria* and *Serafini* by providing that that the Government may appeal from the dismissal of "any one or more counts, *or any part thereof.*" 18 U.S.C. § 3731 (emphasis added).

21

870 F.2d 109, 113 (3d Cir. 1989) (noting the overt-act element of conspiracy under 18 U.S.C. § 371). Thus, if Appellants' motion is meritorious, several of the Government's potential theories of liability under Count One would be "knocked out" at trial as a matter of double jeopardy.

We find this argument unpersuasive. Appellants offer no case law so much as suggesting that *Sanabria* or *Serafini* bear on the scope of the collateral-order doctrine as it pertains to appeals taken by *defendants*. And this is for good reason: Section 3731 deals exclusively with appellate jurisdiction over "an appeal by the United States." The Supreme Court's interpretation of § 3731, and ours, has always been based in large part on the statute's purpose, which is "'to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit.'" *United States v. Farnsworth*, 456 F.3d 394, 399 (3d Cir. 2006) (quoting *United States v. Wilson*, 420 U.S. 332, 337 (1975)). A defendant's right to interlocutory appeal, by contrast, remains subject to the constraints of 28 U.S.C. § 1291, and by extension, the three-pronged *Cohen* test, which requires that the district court's alleged error be "completely separate from the merits of the action" and "effectively unreviewable on appeal from a final judgment." *Coopers*, 437 U.S. at 468. Here, although the collateral-estoppel rights at issue are founded in the Double Jeopardy Clause, Appellants do not "contest[] the very authority of the Government to hale [them] into court to face trial on the charge[s] against [them]." *Abney*, 431 U.S. at 659. Instead, they concede that they face retrial on all counts of conviction regardless of our ruling on the correctness of the District Court's opinion. As a result, any errors in the District Court's application of the

collateral-estoppel doctrine will merely affect the course of the trial, and therefore remain subject to review and redress through the traditional appellate process.

Accordingly, we will dismiss the portion of this appeal pertaining to the District Court's application of the collateral-estoppel doctrine in its order of February 4, 2013 and memorandum of April 5, 2013.

C.

The second question presented is whether we have jurisdiction over the denial of Appellants' motion to preclude the Government from constructively amending the indictment. On this point, too, Appellants argue that the District Court's denial of their motion violates their constitutional right not to be tried, thereby triggering a right to interlocutory appeal under the collateral-order doctrine.

The constitutional provision at issue is the Grand Jury Clause of the Fifth Amendment, which states that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." U.S. Const. amend. V. From that guarantee emerges the well-recognized prohibition on constructive amendment of the indictment at trial, which occurs "when evidence, arguments, or the district court's jury instructions effectively 'amend[s] the indictment by broadening the possible bases for conviction from that which appeared in the indictment.'" *United States v. McKee*, 506 F.3d 225, 229 (3d Cir. 2007) (quoting *United States v. Lee,* 359 F.3d 194, 208 (3d Cir. 2004)). We have characterized constructive amendment as an "exceptional category of error" that "deprives the defendant of his/her

23

'substantial right to be tried only on charges presented in an indictment returned by a grand jury.'" *Id.* at 229 (quoting *United States v. Syme,* 276 F.3d 131, 149 (3d Cir. 2002)); *see also United States v. Vosburgh*, 602 F.3d 512, 531 (3d Cir. 2010) ("'[A] court cannot permit a defendant to be tried on charges that are not made in the indictment against him.'") (quoting *Stirone v. United States*, 361 U.S. 212, 217 (1960)). Accordingly, once a defendant on direct appeal establishes that a conviction was tainted by constructive amendment, we may redress that injury by vacating the conviction. *See, e.g.*, *McKee*, 506 F.3d at 232.

The jurisdictional question presented, however, is not resolved simply because Appellants seek to vindicate a right originating from the Grand Jury Clause. In *Midland Asphalt Co. v. United States*, 489 U.S. 794 (1989), Justice Scalia, writing for a unanimous court, clarified that the Clause only "confer[s] a right not to be tried . . . when there is *no* grand jury indictment." *Id.* at 802 (emphasis added). In other words, the defect at issue must be "so fundamental that it causes the grand jury no longer to be a grand jury, or the indictment no longer to be an indictment . . . ." *Id.* By way of example, allegations of an "isolated breach of the traditional secrecy requirements," or the grand jury's violation of the defendant's right against self-incrimination, are not so fundamental as to implicate a defendant's right not to be tried. *Id.*

Since *Midland Asphalt* was decided, very few federal appellate courts have identified allegations of grand-jury error giving rise to interlocutory jurisdiction. The Tenth Circuit, in a thorough treatment of the subject, limits jurisdiction under *Midland Asphalt* to review of "technical challenge[s] to the *existence* of an indictment," such as where the defendant may

24

have been indicted by an insufficient number of grand jurors. *United States v. Tucker*, 745 F.3d 1054, 1069 (10th Cir. 2014). This accords with our own decisions holding that even allegations of failure to present exculpatory evidence, *see United States v. Johns*, 858 F.2d 154, 156–60 (3d Cir. 1988), and prosecutorial misconduct, *see United States v. Fisher*, 871 F.2d 444, 448–49 (3d Cir. 1989), are insufficient to support interlocutory jurisdiction.

We are aware of only a single decision addressing whether the denial of a pre-trial motion to preclude constructive amendment satisfies the *Midland Asphalt* standard. In *United States v. Asher*, 96 F.3d 270 (7th Cir. 1996), the defendant, who had been previously convicted of charges stemming from participation in a stolen vehicle ring, was again indicted for conspiracy to commit vehicle theft and other offenses based on his allegedly continuing involvement with the same criminal enterprise. After the district court denied the defendant's motion to dismiss under the Double Jeopardy Clause, the defendant challenged that ruling on interlocutory appeal and also alleged that the District Court's interpretation of the indictment constituted a constructive amendment. The Seventh Circuit, without significant analysis, concluded that "[t]he district court's alleged constructive amendment of the indictment is clearly not such a 'fundamental' defect in the grand jury process as to permit immediate appellate review under *Midland Asphalt*." *Id.* at 273.

Here, Appellants do not dispute that a properly seated grand jury considered the Government's evidence and returned an indictment in a manner compliant with traditional grand jury protocols. They allege no technical or procedural violation that would cause "the indictment no longer to be an

25

indictment." *Midland Asphalt*, 489 U.S. at 802. As a result, Appellants will face retrial on certain counts of that indictment regardless of the Government's expected proof and legal theory. If Appellants' contentions regarding constructive amendment prove correct, they may seek relief on direct post-conviction appeal—which has long been the stage at which allegations of constructive amendment are addressed. Accordingly, Appellants have not raised a claim implicating the right not to be tried under the Grand Jury Clause.

For these reasons, we will dismiss the portion of this appeal pertaining to the District Court's denial of Appellants' constructive-amendment claims in its order of February 4, 2013 and memorandum of April 5, 2013.

IV.

In addition to asserting that we have jurisdiction under the collateral-order doctrine, Appellants request that we treat their appeal as a petition for a writ of mandamus, over which we do indeed have jurisdiction. *See* 28 U.S.C. § 1651(a); *United States v. Christian*, 660 F.2d 892, 894 (3d Cir. 1981). Such relief, however, is extraordinary, and is appropriate only upon a showing of (1) a clear abuse of discretion or clear error of law; (2) a lack of an alternate avenue for adequate relief; and (3) a likelihood of irreparable injury. *See United States v. Wexler*, 31 F.3d 117, 128 (3d Cir. 1994) (citations omitted). We have already concluded that Appellants have not raised a claim that would result in irreparable injury if they are forced to pursue relief (in the event of a conviction) via a traditional post-trial appeal. Mandamus relief is therefore unwarranted.

26

## V.

For the aforementioned reasons, we will dismiss the foregoing appeal for lack of jurisdiction and remand for further proceedings consistent with this Opinion.[4]

---

[4] In light of our conclusion that we lack jurisdiction to consider this appeal, we express no view on the merits of the double-jeopardy and constructive-amendment claims presented.